## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANTWON TYLER (K-69489), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 18 C 1449 |
| | ) | |
| RANDY PFISTER, *Warden,* | ) | Judge Rebecca R. Pallmeyer |
| Stateville Correctional Center | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Antwon Tyler, a prisoner at the Stateville Correctional Center, was convicted of murder and armed robbery in 1998. He is serving a life sentence for the murder and a concurrent 30-year sentence for the armed robbery.[1] Tyler has brought a pro se petition for relief from his conviction and sentence pursuant to 28 U.S.C. § 2254. For the reasons explained here, the court denies the petition, and declines to issue a certificate of appealability.

## BACKGROUND

The court presents the facts as set forth in the state court record. (State Court Record [7].) State court factual findings, including facts set forth in state court opinions, have a presumption of correctness, and Petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 583 U.S. 33, 34 (2018) (per

---

[1] This petition, recently reassigned from the calendar of Judge Pacold, challenges Petitioner's convictions from *Illinois v. Tyler*, No. 93 CR 21971 (Circuit Court of Cook County). Petitioner previously challenged an unrelated murder and attempted armed robbery conviction, *Illinois v. Tyler*, No. 93 CR 20392 (Circuit Court of Cook County), in a different habeas corpus action. *Tyler v. Battaglia*, No. 05 C 6364 (N.D. Ill.) (Holderman, J.). Judge Holderman of this court dismissed that petition as untimely under 28 U.S.C. § 2244(d). Because that petition challenged a different state conviction, it does not bar this filing. *See Magwood v. Patterson*, 561 U.S. 320, 331–33 (2010) (explaining that § 2244(b)'s prohibition on second or successive habeas corpus petitions applies to multiple challenges to the same state court judgment, not different judgments).

curiam); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020). Petitioner has not made such a showing.

Petitioner and Marcus Gray committed two armed robberies on Chicago's south side on the evening of March 28, 1993. (*Illinois v. Tyler*, No. 1-98-4088 (Ill. App. Ct. July 27, 2001); Direct Appeal Ord. [7-1] at 1–2.) In the first episode, at approximately 10:30 p.m., the men robbed Danell Morris (Morris robbery). (*Id.* at 2.) They robbed Melvin Slaughter 10 or 15 minutes later; during that second robbery, Edwin Carlock was murdered (Carlock murder). (*Id.* at 2–3.)

Petitioner was tried for the latter episode—the robbery of Melvin Slaughter and the Carlock murder. At the trial, however, the jury also heard extensive evidence about the Morris robbery which had occurred earlier that night. Morris testified that Petitioner and Gray pulled up in their car, a grayish Chevy Impala or Caprice, beside Morris, who was seated in a parked car outside his home. (*Id.* at 2.) According to Morris, Petitioner was the driver and Gray was in the passenger seat. (*Id.*) Morris testified that Gray got out of the car and held a revolver to Morris's face, ordering him to "give me your sh__." (*Id.*) Morris surrendered his earring to Gray; at the same time, Petitioner exited his car, entered Morris's car through the passenger door, and took the car radio and Morris's wallet. (*Id.*) Morris was just one foot away from Petitioner while this occurred and was able to see him well because the car's dome light was illuminated during the entire time Petitioner was in Morris's car. (*Id.*) Morris made an in-court identification of Petitioner during his trial testimony. (Rep. of Trial Proceedings (hereinafter "Trial Record") [7-12] at 55.)

The Carlock murder occurred just a few minutes later and just a few blocks away. (Direct Appeal Ord. at 2.) Carlock (the murder victim) and Slaughter were among a group of friends in a car returning from dinner. Carlock was the driver; his girlfriend, Laveta Hefner, was in the front passenger seat; and their nine-month-old son was in a car seat in the front seat between Carlock and Hefner. Sandra Carlock, the victim's sister, was seated on the driver's side in the back seat, while Melvin Slaughter was in the back seat on the passenger side. Taniesheia Harden, Slaughter's girlfriend, sat in the middle back seat; she and Sandra Carlock held children on their

laps. Harden was holding Carlock and Hefner's two-year old son, while Sandra Carlock was holding her own two-year-old son. (*Id.* at 2–3; Trial Record at 171–72.)

Slaughter testified at trial that the group had stopped at Harden's home. (Direct Appeal Ord. at 3.) When Slaughter exited the car, Hefner rolled down her window and told Slaughter that Carlock wanted Slaughter's page number. (Trial Record at 130.) Slaughter walked Harden to her door, and then returned to the car to give Carlock his pager number. (Direct Appeal Ord. at 3.) Slaughter testified that as he was walking around the rear of the victim's car, a gray or gray-green Chevy pulled up beside the car. (*Id.*) Marcus Gray jumped out of the Chevy, armed with a gun, and told Carlock and Slaughter not to move. (*Id.*) Slaughter, startled, fell backwards onto the ground but testified at trial that he could see Gray's face, and identified Gray at trial. (*Id.*) Sandra Carlock testified that after seeing a man approaching the car with a gun, she screamed at her brother Edwin Carlock to drive off. (Trial Record at 177.) But it was too late: Gray fired into the car, killing Carlock with a gunshot wound to his head. (Direct Appeal Ord. at 4.) The car started to slowly roll forward, and Sandra Carlock tried to grab the steering wheel before the car crashed into a steel railing. (Trial Record at 177–80.)

According to Slaughter's testimony, before pulling the trigger, Gray had said, "There, m—f—" and proceeded to approach Slaughter, who was lying on the ground, and take Slaughter's money and beeper from him. (Direct Appeal Ord. at 3.) Gray then fled in the Chevy, while the victim's car (now driverless) crashed into a roadside railing. (*Id.*)

Harden testified that she was already in her home by the time the Chevy pulled up alongside the victim's car. (*Id.*) When she heard the gunshot, Harden went to her window and looked outside; she saw the gunman standing over Slaughter, who was on the ground. (*Id.*) Harden also testified that she was able to observe the Chevy driver whom she identified at trial as the Petitioner. (*Id.*) The other individuals on the scene—Slaughter, Hefner, and Sandra Carlock, were unable to identify the driver, either before or during trial. (*Id.* at 3–4.)

3

Chicago Police Officer Alfred Schultz was the first officer to arrive at the scene, approximately 15 minutes after the shooting. (Trial Record at 356, 365.) He witnessed Carlock sitting in the front seat of his car with a gunshot wound to his head. (*Id.* at 356.) Schultz called for an ambulance and secured the scene. (*Id.*) He also interviewed Sandra Carlock, Melvin Slaughter, and Laveta Heffner. (*Id.* at 370–71.) As he explained in his trial testimony, Officer Schultz was unable to get a precise description of the assailants from Sandra Carlock, Slaughter, and Heffner because they were "pretty shooken up," but they did tell him that the offenders' car was a four-door green Chevy. (*Id.* at 363.) They were also able to tell the officer that they recognized the offenders from living in that neighborhood. (*Id.* at 359 ("Q. And do you remember if these witnesses described the driver of—the person of—the possible offenders in this incident? A. They the [sic] not give me an actual physical description. I was advised by at least two of them that they recognized them from the area but they could not correlate any names or anything with it.").)

No witnesses identified Petitioner as the driver until well after the night of the shooting. For example, the Chicago Police Department conducted a lineup approximately two months after the incident. (Direct Appeal Ord. at 4.) The record does not clarify what prompted this lineup (or even whether it included Petitioner), but Morris viewed it and did not identify anyone as the assailant from his robbery. (*Id.*) Working with the police, Morris, Harden, and Slaughter also generated computer sketches of the shooter and driver at some point. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *1.

It was not until approximately six months after the murder that Petitioner was affirmatively identified by any witness. The tide turned in August, when Petitioner and Gray's photographs appeared in the Chicago Sun-Times.[2] *Id.* Slaughter walked over to Morris' home—they had

---

[2] The record does not explain the reason for the Sun Times photos, but circumstances suggest they were published after a subsequent offense—the one ultimately resulting in the habeas petition referred to in footnote 1. *See* Philip J. O'Connor, *Nurse Slain for Auto Part, Cops Say*, CHI. SUN TIMES, Aug. 24, 1993, at 12.

4

known each other for seven years and had compared notes the night of the robberies—and showed him the pictures in the paper. (*Id.*; Trial Record at 140–41, 156.) Slaughter also "talked to Taniesheia [Harden] about the photos that [he] had seen in the paper."[3] (Trial Record at 157.) And the next day, Morris, Slaughter, Hefner, and Harden viewed a second lineup, at which both Petitioner and Gray were present. (Direct Appeal Ord. at 4.) At this second lineup, Hefner was not able to make any identification, but Slaughter identified Gray as the gunman/passenger, and Morris and Harden both identified Petitioner as the driver, and Gray as the gunman/passenger. (*Id.*) At trial, Morris explained that he had previously seen Petitioner at neighborhood basketball courts but had not made this connection on the night of the robberies and murder. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *1. Harden—the only witness to the Carlock murder who affirmatively identified Petitioner—testified that she had known Petitioner in high school, but had "not recognize[d]" him "at the time of the incident" and only recalled that "he looked familiar" months later, when she saw "police photographs."[4] *Id.* at *2.

Ultimately, Petitioner was convicted at trial of murder and armed robbery on Harden's and Morris' identifications,[5] and sentenced to natural life for the murder plus a concurrent 30-year sentence for the robbery. (Direct Appeal Ord. at 5.) On direct appeal, Petitioner argued that the trial court had erred in admitting the evidence of the Morris robbery. (*Id.* at 1.) The First Appellate Court of Illinois affirmed (*id.* at 1), and the Supreme Court of Illinois denied his petition for leave to appeal (PLA), *Illinois v. Tyler*, No. 92724, 766 N.E.2d 244 (Ill. Feb. 6, 2002) (Table).

---

[3]     Harden testified that she had not seen the newspaper photographs before the lineup procedure on August 25th. (Trial record at 270.)

[4]     The record is vague as to which photographs Harden was referring to, and when she viewed them. In her trial testimony, Harden claimed that "when we were doing the pictures telling the police how he looked I kept saying [Tyler] looked familiar, he looked familiar." (Trial Record at 288.) It is possible that Harden is referring to the time that she, Slaughter, and Morris worked with police to create computer sketches of Petitioner and Gray. *See Tyler*, No. 1-14-1897, 2017 WL 2602633, at *1. If so, the record is unclear as to exactly when these sketches were created, let alone whether details beyond the witnesses' own memories contributed to them.

[5]     No physical evidence tying Petitioner to the crime was presented to the jury.

Petitioner sought post-conviction relief in the state court as well, raising three grounds: First, that trial counsel was ineffective for failing to object to Illinois Pattern Jury Instruction (IPI) Criminal 3rd No. 3.15, an instruction concerning eyewitness identifications whose use was later held to constitute plain error; second, that the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not failing to turn over a police report concerning Harden's testimony; and third, that counsel on direct appeal was ineffective for not raising these issues. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *1. His post-conviction petition was denied, and the appellate court affirmed. *Id.* Petitioner sought leave to appeal, but the Illinois Supreme Court denied the PLA, thus completing post-conviction proceedings. *Illinois v. Tyler*, No. 122690, 93 N.E.3d 1072 (Ill. Nov. 22, 2017) (Table). His habeas corpus petition [1] is now before this court.[6]

## DISCUSSION

Petitioner repeats a number of these claims as grounds for habeas relief. He argues that his trial counsel was ineffective for failing to object to Illinois Pattern Instruction 3.15; that the State violated *Brady* by failing to disclose impeachment evidence; and that the trial court's decision to allow extensive testimony from Morris detailing a wholly separate robbery violated Petitioner's due process right to a fair trial. (Petition for Writ of Habeas Corpus (hereinafter "Federal Habeas Petition") [1] at 5–6.) The court discusses each claim in turn.[7]

---

[6]     Petitioner filed his habeas petition in February 2018, and it has been pending for over six years. His case was only recently reassigned to this court. (*See* Minute Entry [40].)

[7]     The Antiterrorism and Effective Death Penalty Act (AEDPA) requires a habeas petitioner to "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust a claim sufficient for habeas review under AEDPA, "the petitioner must assert his federal claim through one complete round of state-court review, either on direct appeal or in post-conviction proceedings." *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009). Petitioner exhausted his first and second claims in post-conviction proceedings and his third on direct appeal. Accordingly, AEDPA's exhaustion requirement does not bar his petition.

I.  **Claim One: Ineffective Assistance of Counsel Regarding Illinois Pattern Instruction 3.15**

Petitioner argues that his trial counsel was ineffective for failing to object to the jury instructions given at trial regarding eyewitness identification.  (Federal Habeas Petition at 7–8.) Without objection from defense counsel, the trial judge gave Illinois Pattern Jury Criminal Instruction (IPI) No. 3.15 to the jury.  *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *1; (Trial Record at 317, 464.)  That instruction states:

> When you weigh the identification testimony of a witness you should consider all of the facts and circumstances in evidence including but not limited to the following:
>
> The opportunity the witness had to view the offender at the time of the offense; or
>
> The witness' degree of attention at the time of the offense; or
>
> The witness' earlier description of the offender; or
>
> The level of certainty shown by the witness when confronting the defendant; or
>
> The length of time between the offense and the identification confrontation.

(*Id.* at 464).  There is no dispute that this version of the pattern instruction was the one approved at the time of Petitioner's trial in 1998.  *See Smith v. McKee*, 598 F.3d 374, 384 (7th Cir. 2010) (explaining that IPI 3.15 pattern instruction included the "or" language between 1992 through 2001).

In November of 2001, three and a half years after Petitioner's trial, the First District Appellate Court of Illinois, in an unrelated case, *Illinois v. Gonzalez*, held that giving the jury instruction with the "or" disjunction is error because "it 'implied, as a matter of law, that the identification testimony of an eyewitness may be deemed reliable if just one of the five factors listed weighs in favor of reliability.'"  *Smith*, 598 F.3d at 383 (quoting *Illinois v. Gonzalez*, 326 Ill. App. 3d 629, 640, 761 N.E.2d 198, 207 (1st Dist. 2001)).  In 2005, the Supreme Court of Illinois agreed with *Gonzalez*, holding that the inclusion of the word "or" in the instruction is error. *Illinois v. Herron*, 215 Ill.2d 167, 191, 830 N.E.2d 467, 482 (Ill. 2005); *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *4.

In his state post-conviction submission, citing *Gonzalez*, Petitioner argued that his trial lawyer was ineffective for failing to object to the use of the word "or." *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *4. The state appellate court, the last state court to consider Petitioner's claim on the merits, rejected that claim under the standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984), explaining that "a claim of ineffective assistance of counsel cannot be based on counsel's failure to invoke a ruling that had not yet occurred." *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *4 (internal quotation marks and citations omitted).

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), this court's review is limited to that state post-conviction opinion, since it was the last state adjudication of the merits of Petitioner's claim. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)). Accordingly, the court looks to that opinion in determining whether federal habeas relief is available to Petitioner. The court agrees that, as the Illinois Supreme Court has concluded, the disjunctive "or" in the instruction is troublesome.[8] As explained here however, AEDPA bars this court from granting relief on this basis.

Under AEDPA, the court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the

---

[8] The corresponding Seventh Circuit instruction tells the jury to consider similar factors cumulatively. *See* Seventh Circuit Pattern Criminal Federal Jury Instructions § 3.12, at 52 (2023) (instructing jurors to consider "the opportunity the witness had to observe the person . . . and to make a reliable identification later. . . . [and to] *also* consider the circumstances under which the witness later made the identification") (emphasis added)).

benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The clearly established law applicable to Petitioner's ineffective assistance claim is the standard announced in *Strickland*. To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The court's review under *Strickland* is deferential, and applying *Strickland* under AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

In this case, the state appellate court cited to, and applied, the controlling *Strickland* standard. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *4. As the state court recognized, effective assistance does not require that counsel raise an objection at Petitioner's 1998 trial to the IPI 3.15 pattern instructions in effect at that time. *See Ramirez v. Tegels*, 963 F.3d 604, 614 (7th Cir. 2020) (citing *Shaw v. Wilson*, 721 F.3d 908, 916-17 (7th Cir. 2013)) ("An attorney is not required to anticipate changes in the law that were not sufficiently foreshadowed in existing caselaw."); *Smith*, 598 F.3d at 384 ("Pattern Jury Instruction 3.15 was codified in 1992 and remained in use until 2001. Defense counsel did not act in an objectively unreasonable manner by not objecting to the use of an applicable pattern jury instruction."). The state appellate court properly rejected Petitioner's *Strickland* claim. As the state court ruling was correct, Petitioner cannot meet his demanding burden of showing the state court ruling was contrary to, or an unreasonable application of, *Strickland*.[9]

---

[9]     In addition to finding no deficient performance on the part of Petitioner's lawyer, the state court also noted that "petitioner cannot establish prejudice because the evidence of his guilt was substantial and he has not demonstrated how giving the instruction in the conjunctive ("and"), rather than the disjunctive ("or"), would have had an impact on the jury's deliberation." *People v. Tyler*, No. 1-14-1897, 2017 WL 2602633, at *4. This court is less certain about this conclusion. The evidence appears to be limited to the eyewitness identification of a single person present at the crime (and 30 feet away), paired with a second identification stemming from a separate robbery. Neither of these witnesses described Petitioner on the night of the robberies; both identified him months later. Moreover, as Petitioner notes, the *Strickland* prejudice prong requires showing only of a "reasonable probability" that the outcome would have been different

As an additional point, Petitioner's central challenge is directed at counsel's failure to object to the jury instruction given at trial, his petition does also include one sentence arguing that appellate counsel was ineffective for failing to raise the instruction issue on direct appeal. (Federal Habeas Petition at 8.) But that claim, if it had been adequately developed, would be a non-starter for the same reason: As mentioned above, there was no indication in Illinois law that the instruction was defective until the *Gonzalez* opinion was issued on November 26, 2001, 326 Ill. App. 3d at 640, 761 N.E.2d at 198. The state appellate court issued its ruling on Petitioner's direct appeal on July 27, 2001, four months before *Gonzalez*. (Direct Appeal Ord. at 1.) Like trial counsel, appellate counsel on direct appeal cannot be faulted for failing to raise the issue prior to *Gonzalez's* issuance.

It is true that Petitioner's *pro se* PLA on direct review, which he filed on November 15, 2001 (Direct Appeal PLA [7-5]), was pending before the Supreme Court of Illinois when *Gonzalez* was issued. Petitioner could have supplemented his PLA to include the issue following the *Gonzalez* opinion, but there is no indication in the record that he availed himself of that opportunity. *See generally Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (holding that a new rule for the conduct of criminal prosecutions applies retroactively to all cases, state or federal, pending on direct review); *Illinois v. Stechly*, 225 Ill.2d 246, 268, 870 N.E.2d 333, 348 (Ill. 2007) (allowing criminal defendant to raise new claim for first time on direct appeal before that court when argument was not previously available before the Appellate Court of Illinois on direct appeal). More fundamentally, a prisoner cannot raise an ineffective assistance of appellate counsel argument regarding performance during a discretionary appeal before a state supreme court because there is no constitutional right to effective assistance of counsel in that proceeding.

---

but for the lawyer's deficient performance—not that a different instruction "would have had an impact on the jury's deliberation." (*See* Petitioner's Reply to Respondent's Answer [11] at 13–15.) That said, however, relief is foreclosed here because the state court did conclude reasonably that trial counsel's conduct was not deficient under *Strickland's* first prong.

*Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) (citing *Wainwright v. Torna*, 455 U.S. 586 (1982); *Ross v. Moffitt*, 417 U.S. 600 (1974)). Claim One is denied.

## II.     Claim Two: *Brady* Claim Regarding Police Report

Petitioner alleges a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), regarding the prosecution's failure to disclose a police report associated with Harden's trial testimony. On cross examination, Harden admitted that she had attended the same high school as Petitioner for about two months. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *2. She testified that Petitioner "was probably a senior at the time" (when Harden was a freshman) and that she knew him from "seeing him around" the school. (*Id.*; Trial Record at 287.) She acknowledged, however, that she never provided Petitioner's name to the police or told them that she knew him. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *2. Then on redirect examination, Harden explained her failure to do so by saying that she merely recalled seeing Petitioner around the high school before transferring to a different school, and she did not know him by name. *Id*.

A police report that did not surface during trial potentially complicated this story. The police report concerned events at a New Year's Eve party on January 1, 1992, just three months before the episode at issue in this case. *Id*. at *3. According to the report, gun shots were fired at the party after Petitioner got into an argument with another man there. *Id*. Petitioner also allegedly damaged several car windows and a garage door with a baseball bat. *Id*. Of relevance to the present claim, the report lists Harden as one of three witnesses at the New Year's Eve party incident involving Petitioner, who was identified by name in the report. *Id*. Though any of the three witnesses listed in the report could have been the one that identified Petitioner, the report at least raises the question of whether Harden knew Petitioner by name around the time of the Carlock murder.

Petitioner appears to have known about this report at the time of his trial for the Carlock murder; he told defense counsel about the police report following Harden's testimony, and counsel brought a post judgment motion arguing Harden perjured herself at trial. *Id*. The trial

court denied the motion, however, *id.*, and Petitioner did not pursue the issue on direct appeal. (Direct Appeal Ord.) He did, however, raise the issue in his state post-conviction petition, arguing there that the police report concerning the New Year's party shows that Harden lied in her testimony, at trial in this case, that she did not know Petitioner beyond recognizing him from high school. *Tyler*, No. 1-14-1897, 2017 WL 2602633, at *3. The First District Appellate Court—the last state court to consider Petitioner's claim on the merits—held the issue of Harden's testimony was forfeited because Plaintiff did not raise that issue on direct appeal. *Id.* at *4. In any event, the state court concluded that the challenge was meritless. *Id.* at *5. Specifically, the court pointed out that any of the three witnesses listed in the police report could have identified Petitioner, so there was no guarantee that Harden had actually been the one who named him. *Id.* Furthermore, Harden's testimony at trial—that Petitioner "looked familiar" and that she knew him from high school—was not inconsistent with her having identified him by name in the police report. *Id.* Put differently, in the state court's view, "Harden did not testify that she *only* knew petitioner" from high school, so even if she had identified him in the separate police report, that fact would "in no way unequivocally establish[] that [she] committed perjury." *Id.*

Petitioner raises the matter again before this court; he claims that the police report from the party demonstrates that Harden's testimony at the trial was not truthful, and that the prosecution had a duty to disclose the report under *Brady*.

As Respondent observes, the claim is procedurally defaulted because it is barred by an adequate and independent state ground of decision: Illinois law requires a defendant to raise all issues that can be addressed on direct appeal, and failure to do so results in forfeiture, barring the consideration of the claim in a post-conviction proceeding. *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) (citing *Illinois v. Erickson*, 161 Ill.2d 82, 87, 641 N.E.2d 455, 458 (Ill. 1994)). When, as here, the state court clearly and expressly relies upon the procedural bar, the claim is procedurally defaulted. *Smith*, 598 F.3d at 383.

Petitioner cannot excuse his default through either cause and prejudice, nor is there a basis for finding a fundamental miscarriage of justice. Cause, for purposes of the "cause and prejudice" analysis, is an "'objective factor, external to [Petitioner], that impeded [his] efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith*, 596 F.3d at 382). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).

Here, the only potential argument for cause that would excuse the procedural default is that counsel on direct appeal was ineffective for failing to raise the *Brady* claim. (Opening Brief on Postconviction Appeal [7-8] at 2; Postconviction PLA [7-11] at 3.) In assessing this argument, the *Strickland* standard again applies. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). Petitioner cannot meet that standard because he cannot establish that appellate counsel's performance was deficient. *Brady* does not require a prosecutor to disclose impeachment evidence of which the defendant is aware. *Long v. Pfister*, 874 F.3d 544, 549-50 (7th Cir. 2017) (en banc) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)) ("The Supreme Court has considered whether *Brady* requires the prosecution to disclose (or put before the jury) exculpatory or impeaching information known to the defense. The answer is no."). Petitioner concedes he knew of the police report; he told his attorney about it after Harden's testimony. Thus, there is no *Brady* violation in this case, his appellate attorney on direct appeal was not ineffective for failing to raise the issue, and counsel's performance does not constitute "cause" to excuse the default of the *Brady* claim under the cause and prejudice standard.

This leaves the fundamental-miscarriage-of-justice (actual innocence) gateway to excuse Petitioner's default. To establish actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v.*

13

*Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggin*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). To mount a credible claim of actual innocence, Petitioner must present new, reliable evidence that was not presented at trial, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDowell v. Lemke*, 737 F.3d 476, 483–84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Petitioner presents no such new evidence of innocence. Claim Two is denied.[10]

### III. Claim Three: Other Crime Evidence

Petitioner's final argument is that the state court erred in allowing the introduction of evidence regarding the Morris robbery as other crime evidence. Specifically, in his reply brief, Petitioner argues that: 1) introducing evidence of the Morris robbery violated his due process right to a fair trial; 2) he raised this constitutional claim below; and 3) the state court ignored the constitutional claim and resolved the evidentiary question on appeal solely on state-law grounds, thus not precluding merits review here. (*See* Reply at 22–26.) But this argument fails for numerous reasons.

First, challenges to state evidentiary rulings are traditionally non-cognizable state law claims. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Second, to the extent that the state resolved the issue on a constitutional ground, the claim would be governed by AEDPA's deferential standard set forth in § 2254(d). The Supreme Court has not resolved whether the use of "prior crime" evidence to show propensity to commit a

---

[10] Petitioner also argues that his counsel was ineffective in handling the *Brady* claim in the post-conviction proceedings. Ineffective assistance of post-conviction counsel is not grounds for habeas corpus relief, 28 U.S.C. § 2254(i), and cannot be used by an Illinois prisoner to excuse procedural default. *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018).

charged crime violates the Due Process Clause of the Constitution. *Estelle*, 502 U.S. at 75 n.5 (1991) ("We express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charge crime."). As this is an open question, Petitioner cannot obtain relief under the AEDPA because he must show the state court ruling is contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court. *Long*, 874 F.3d at 550; *United States ex rel. Dabbs v. Godinez*, No. 11-1137, 2013 WL 1337189, at *4 (C.D. Ill. Apr. 1, 2013).

Finally, even if the court could reach the merits of a due process claim on this point, Petitioner would not be entitled to relief. An evidentiary issue results in a due process violation when the "error produced a significant likelihood that an innocent person has been convicted." *Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001). Petitioner may not view the evidence tying him to the Carlock murder and Morris robbery as overwhelming, but it is "black letter law" that the jury could have sufficiently relied on a single eyewitness identification in convicting him, and that occurred in this case: Harden identified Petitioner as the driver. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). It was not a violation of due process to admit Morris' testimony separately identifying Petitioner as the driver, during a robbery just blocks away, in the same type of car, and just minutes before the Carlock murder. In other words, Petitioner has not shown that an error, if any, makes it significantly likely that Petitioner is innocent of the Carlock murder.

Claim Three is denied. The habeas corpus petition is denied on the merits.[11]

---

[11]     At a December 17, 2019 status hearing before Judge Pacold of this court, Petitioner requested recruitment of counsel and an evidentiary hearing. (Minute Entry [24].) Those requests are denied. Counsel is provided in a habeas corpus proceeding only when an evidentiary hearing is needed or if the interests of justice require. *See* 18 U.S.C. § 3006A(a)(2)(B); *Martel v. Clair*, 565 U.S. 648, 659 (2012); Rule 8(c), Rules Governing Section 2254 Cases. Because Petitioner's claims have been fully and effectively briefed, the court declines to recruit an attorney. With respect to Petitioner's request for an evidentiary hearing, "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief . . . . It follows that if the record [] precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also* 28 U.S.C. § 2254(e)(2)(B). Because the record defeats Petitioner's claims, the court declines that request for an evidentiary hearing as well.

**IV.  Certificate of Appealability and Notice of Appeal Rights**

The court declines to issue a certificate of appealability.  Petitioner cannot make a substantial showing of the denial of a constitutional right; in other words, reasonable jurists would not debate this court's resolution of Petitioner's claims.  *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this court.  If Petitioner wishes to appeal, he must file a notice of appeal within thirty days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(1).  Petitioner need not bring a motion to reconsider this court's ruling to preserve his appellate rights, but if he does seek reconsideration, Petitioner is free to file a motion under Federal Rule of Civil Procedure 59(e) or 60(b).  Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment.  *See* Fed. R. Civ. P. 59(e).  The time to file a motion pursuant to Rule 59(e) cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2).  A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order.  *See* Fed. R. Civ. P. 60(c)(1).  The time to file a Rule 60(b) motion cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2).  A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## <u>CONCLUSION</u>

Petitioner's habeas corpus petition [1] is denied on the merits.  Petitioner's oral requests for counsel and an evidentiary hearing made at the December 17, 2019, status hearing [24] are denied.  The court declines to issue a certificate of appealability.  The Clerk is instructed to: (1) terminate Respondent Randy Pfister and replace him with Petitioner's current custodian, Charles

Truitt, Warden, Stateville Correctional Center; (2) alter the case caption to *Tyler v. Truitt* and, (3) enter a judgment in favor of Respondent and against Petitioner.  Civil Case Terminated.

ENTER:

Dated:  June 25, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

17